We'll hear argument next in No. 20-1064, MediciNova, Inc. v. Genzyme Corporation. Mr. Chapman. Thank you, Your Honor. May it please the Court. This is a contract case whose resolution depends entirely on patent claim construction. The only claim term construed was stocked of recombinant adeno-associated virus, and that appears in four independent claims. Through a complex logical chain, the District Court construed virus to mean virions, and then construed virions to require a negative process limitation that virions not be made using herpes simplex virus 1 or HSV1. Rather than simply construing the claim term at issue, the District Court appears to have poured all of what it believed the invention to be into that term. In doing so, it brought limitations not present in some of the independent claims into those claims by construction of the mere six words. But I believe the logical chain has flaws, which I will address, starting with the packaged issue. Well, the real problem you have, right, is that negative limitation, because that's what-that's where the non-infringement position really turns, right? That's correct, Your Honor. And it is only through the construction of virus to be virion that that negative limitation comes in. But perhaps I should start with the negative limitation. Well, I'm just wondering, if we were to assume that that virions-that the virions construction is the correct one, does that end the inquiry for you, or is there anything you could argue as it relates to the negative limitation that would still let you survive here? Yes. I do believe that there are things about the negative limitation that do survive. As a matter of fact, the District Court characterized it as an exclusion, and I believe that that is overstating the issue considerably. The summary of the invention, and this is at column four, lines 35 to 38, says that the accessory function, which is the source of the so-called exclusion, may be expressed in several ways, and it cites, as an example, all herpes virus generally. So that's in the summary of the invention. Well, this is Judge Breyer. It cites two herpes viruses, but you added the word all, and I don't see that in the specification. It seems to me that it is one thing to say that herpes viruses generally can be used, but where there's an express exclusion of one type of herpes virus, HSV1, it seems to me that that's not inconsistent with saying that herpes viruses generally can be subject to the exclusion of one type. You're correct, Your Honor. The summary of the invention does not use the word all. It just says herpes virus generally, but I do think it's significant where that appears in the summary of the invention compared to the statement in the preferred embodiment. At page 54, I believe, of Genzyme's brief, they state their belief that the inventor deemed HSV1-derived accessory functions as less efficient, and accepting that as true, then in the preferred embodiment, the inventor indeed should have specified what it, what he considered the most efficient way of doing that, and clearly he's given guidance that you should use herpes virus other than HSV1. There's no doubt about it, but the statement in the specification in the preferred embodiment does not say that HSV1 would fail to work. It simply says that there are other things you should use, and that's in part the reason why I think that- Does it matter if it, does it matter if it doesn't say it'll fail to work? I mean, as long as, as long as the patent says don't use it, it's a required negative limitation whether there was a good reason for saying it or not, right? Well, I think that in the patent, in my view, Your Honor, it doesn't say don't use it. It says use these other things, and I believe there's a difference, and that difference is important because of the best mode requirement. If the inventor was required, you know, if the inventor thought that HSV1 was not an optimal way of practicing the invention, then he was required to say that, but that is different from saying that HSV1 wouldn't work. As a matter of fact, it could be extrinsic evidence seems to speak entirely to the fact that it was understood that it would work. So- Now, the statement in the, the place in which the exception for herpes HSV1 shows up is in a definitional section, and that's the definition of accessory functions. So, as I read it, the definition itself is excluding herpes simplex virus type 1, rather than it being simply a statement that somewhere along the line in the specification that it doesn't work as well or should be avoided. I have- Doesn't that create a further problem for you in that it's definitional in nature? It would if it were definitional, but I would like to take issue with that. It certainly appears in the section labeled definitions, but the paragraph where the term accessory function is defined, the first sentence gives the definition of accessory function, and the second sentence clarifies what falls within it, and then I believe the third sentence provides the inventor's best mode of, or preferred way of achieving or deriving the accessory function, and that's consistent with the way these other definitional paragraphs work. For example, the paragraph above it defines the AAV helper construct, and it has a definition, and then it's followed by examples that can be used, and I don't think looking at that paragraph that it would be fair to say that the examples are the sole way of developing a helper construct. Similarly, I don't think- I'm not understanding what you're saying. I mean, that paragraph- the first paragraph in the accessory function's definition is where the exclusion takes place, and that's not an example, is it? Well, what I'm saying is the first sentence is in the definition, and the second sentence in that paragraph clarifies the definition, and then the third says how accessory functions can be derived, and I'm saying that that's similar to other paragraphs where there's a definition followed by examples, so- But isn't that inconsistent with the position you took in the prosecution history? As I read the prosecution history, there was a statement that the definition of accessory functions-this is by your prosecuting counsel-the definition of accessory functions includes viral-based accessory functions derived from any of the known viruses, such as adenovirus, herpesvirus, other than HSV1 and vaccinia virus. That sounds like it's confirming that this is definitional. Again, I think that it's the word includes that distinguishes that, and I believe you're referring to appendix 2152, which is what I'm looking at. If it said only includes or excludes, certainly it does include those things. In order for that argument to be logically consistent, it would seem to me you have to be saying it includes X, Y, but not Z, but then you would have to be arguing that includes does not exclude Z, and yet the very language of includes X and Y but not Z seems to me to foreclose the argument that includes allows you to bring Z back, if you understand the point. I do understand the point, and I think-and that is one way to read this, however, your honor, I would go back to the actual patent language, which is what's being quoted there, and I believe that the definitional part of that paragraph comes in the first two sentences, and so it's really just quoting from that paragraph, not changing the meaning of it. All right, do you want to go back to your predicate argument, which is that you never even get there because it's not a virion? Yes, I would like to, thank you, your honor, the-and I'd like to start with packaged. The claim one and eight require a stock of recombinant adeno-associated virus include a packaged adeno-associated virus vector. The district court construed that as requiring a virion, but it's redefining and taking all of the limitations of the claim and putting it into the term in the preamble that I believe in error. Essentially, the district court ends up describing claim one as a stock of virions that comprise virions. In that sense, it doesn't make sense. There's redundancy, and in addition, it implies- Well, isn't the whole point of the patent to send packaged product to the cells? I mean, the whole point is to deliver the DNA, right? That's correct, your honor, and it's delivered through a vector, and the vector is defined in the patent as rather broadly, including virions, but including other things, including plasmids, and there is an example in the patent of using a plasmid as a vector for RAAV. Okay. Are there further questions? Because I think we're out of time here. I-yes, I think I'd like to reserve whatever time I have left for rebuttal. Yeah, I don't-we'll either give you two minutes or the greater of what time you have left. Thank you, your honor. Thank you. Mr. D. Giovanni. Thank you, your honor, and may it please the court. That's Frankie Giovanni for Genzyme Corporation. The district court correctly construed the claim term a stock of recombinant adeno-associated virus to mean a stock of recombinant adeno-associated virus virions, and then correctly applied the patent's express definition to that term to arrive at the correct claim construction. What do you make-or what are we to make of the fact that while the patent does start out referring fairly regularly to virions, the word sort of just disappears as time goes on, and it really doesn't make sense that it doesn't even show up in the claims. Your honor, I would, you know, in terms of that it-the concept that virions disappears, I think the virions phrase appears throughout the specification, throughout the prosecution history. So I, you know, I take issue with- Well, it doesn't appear much after the first half of the specification, does it? Well, I think the second half is scientific in terms of it showing some experiments that are undertaken. But then it does appear again back in the, you know, column 18, the very last column. It actually appears twice. So I think it does appear throughout the patent. And, you know, I don't think there's any reason why that would override the eight or nine independent ways that the intrinsic evidence shows, as found by the district court, that the term stock of RAAV means stock of RAAV virions. So your position, I take it, is that any time the expression RAAV appears, that it means RAAV virions, right? Well, your honor, I would say that we don't need to decide that because- Well, but I-is that where-is that what you think is the correct interpretation of that term as used in the patent? I would-your honor, I know that a stock of recombinant adeno-associated virus means a stock of recombinant adeno-associated virus virions. That was the issue that the court addressed. That was the issue that the party has addressed. In terms of whether AAV itself- No, RAAV, not just AAV. Got it. Your honor, I would say, yes, I do believe that when RAAV is used, it does-it is referring to virions. I mean, it is context-specific, but I believe that was the intent of the patent. Now, in the paragraph that follows Table 1-you were just reciting Column 18-the in-summary paragraph refers to the two controls there, the PAAV slash AD and the PW1909 as compared to the PHLP19. And there, the conclusion is that the two controls produce these AAV virions, and then it says that the AAV helper, in this case, the PHLP19, produces RAAV. Now, is it your understanding from that example that was summarized in Table 1 that the RAAV referred to there necessarily has to be virions because they're referring to the production of virions in those three different experiments? Yes, your honor, that is the position, and I think that's supported by the specification. And I think when AAV is used by itself in referring to helper constructs, that's a different concept. That's talking about the AAV, the source of the material. But in terms of RAAV, and especially a stock of RAAV, that is a stock of combinant adeno-associated virus virions. Okay. So, your honor, I would then want to talk a little bit about the Edwards case and the advanced fiber case, because what I've heard from, what I've seen in the briefing from MedicineOva and Mr. Chapman's argument... You mean Anderson fiber, is that what you were talking about? No, your honor, I was, the case I was referring to is, I believe it's advanced fiber, I'm sorry. Advanced fiber technologies versus J&L fiber. Yeah. All right. Sure. So, one of the chief arguments that is repeated by MedicineOva is that the definition of RAAV virion shouldn't be used because that phrase is not used in the claim. Well, that theory or that argument is clearly rebutted by both the Edwards case, that's the Edwards life sciences versus Cook case, and the advanced fiber case, advanced fiber versus J&L fiber. In both of those cases, the court conducted a claim construction under using the Phillips standards, and in doing so, began the construction of one term, and that term, under Phillips, naturally included another term. And then when the court addressed that secondary term, the court in Edwards went right to the definition. So, you know, Edwards is directly on point in terms of using an express definition to define a term that wasn't actually used in the claim. And advanced fiber is very similar. In fact, in the Edwards case, there were several steps. The court there was looking at the term graft in the claim language, which the court under Phillips said required interluminal as a descriptor, and then interluminal required wires, and then the wires must be malleable, and then the court said there's an express definition of malleable. So while Medicinova talks about logical leaps that the district court took here, there was no improper logical leaps whatsoever. In fact, it was just a one-step, I can call it a derivative claim construction because that's the term that this court used in advanced fiber. So both those cases show that the term that's being construed under Phillips and being construed using express definitions does not have to actually appear in the term. So that is a situation we have in our case. Could I go back, though? Can I go back to, I'm sorry. No, no, Judge O'Malley, go ahead. Is there any other way in the art to package RAAV other than invariance? Because it just strikes me as odd that the word packaged would be used as opposed to variance or packaged into variance. Sure, Your Honor, and I'll refer back to what the district court found, and this was a factual finding after addressing the extrinsic evidence, including expert testimony from both parties. And the court found that the use of packaged means that genetic material, the RAAV, is packaged into a virion. So the answer to your question has already been answered by the district court, and that's reviewed only by clear error. So both experts stated, you know, Dr. Byrne, who was Genzyme's expert, said that absolutely package means the final, you know, the final assembly step, and thus that packaged being used in the prior art means that the genetic material is a virion. Dr. Byrne repeated that. I'm sorry, Dr. Berger, who was Metasinova's expert, confirmed that on cross-examination at his first deposition. So, you know, we have a situation here where both experts agree that packaged indicated, does indicate that in fact the claimed genetic element is a virion, and the court found that. So that is subject to clear error standard, which, you know, in the briefing, Metasinova doesn't even try to try to meet that. Could I return to the question that Judge O'Malley asked your opposing counsel early in his argument, because I'm still a little confused about the relationship between the two issues in this case. I understand that even if we affirm on the first issue, the virion issue, but were to reverse on the herpes HSV-1 issue, that you would lose this case. That's my understanding. All right. If that's right, what if we were to reverse on the first issue and affirm on the HSV-1 issue? What would be the outcome in that setting? So if I understand the question, Your Honor, if you would reverse on the first issue and not read in, you're not reading, I don't like the phrase read in, I'm sorry, not construe a stock of RAAV, strike that, Your Honor. If you would not, if you don't construe a stock of recombinant AAV virus to mean a stock of recombinant AAV virus virions, which is what the district court did, if you don't do that, but you still look at the definitions and require that HSV-1 be excluded from the scope of the claims, we still win, okay? We still win. So, but I, you know, I would say, Your Honor. You don't think the district court, that wouldn't be an issue that would have to be sent back to the district court for the district court to sort out? Your Honor, so long as that express definition that's provided in there still applies to the claim term, then I would say it doesn't need to be sent back because the exception would still apply. So I. Well, the exception would be applied. The question is what would be the implications of that for the case? In other words, is there any way that Medicinova could still win the case, even if hampered by the definitional construction given to the HSV-1 exclusion? And you're saying no. I'm saying no, but I would say this is that if the pretext of that question is that the definition no longer applies because the word virions doesn't, you know, does not appear in the court's construction, you know, if that definition doesn't apply or the court doesn't apply that definition, then there's an issue of, you know, then there's a problem, I would say, an incorrect reading because then the definition arguably could be, the exclusion could arguably be read out of the claim term. So I. Yeah, is there any place where accessory functions, I mean, we have to get to the accessory function definition to get to the other than herpes simplex virus type 1 and the accessory function is used in the definition of recombinant AAV virin, but I don't see accessory function used anywhere else. In other words, is that why that argument is preceded this way? You have to get to the virin before you can get to the accessory function? I mean, I guess in terms of that question, you know, we didn't work backwards from our results here, but the, you're correct in terms of that is how the definitional exclusion flows. You get to the virion definition which requires accessory functions and then you get to accessory function definition which has the exclusion. If the question is independent of the first definition, the definition of RAA virion, is there an argument that accessory functions should be read into that claim? I don't know that either party has gone that direction and perhaps there could be an argument to be made that it does. I don't know that I know the answer to that now, but I would say that, you know, as a whole, when the entire specification is focused on the creation of these stocks of recombinant AAV virus virions using accessory functions. And I would say this in terms of that first part of the construction in terms of interpreting the stock of recombinant AAV virus to mean stock of recombinant AAV virus virions. You know, I mentioned that the district court found eight independent ways that the intrinsic evidence supported that construction, but what I didn't mention yet was the extrinsic evidence. And I think there are three different pieces of extrinsic evidence that the court found that can only be reviewed by clear error that would have to be overcome by Medicinova and they haven't done that. And, you know, on the first one, perhaps the most important one is that, in fact, the phrase a stock of RAAV is composed of virions. Now, that's something the court found and that's in Appendix 35 through 36 and it's supported by both experts. Remember, you may recall the expert, Dr. Berger, who's the expert for Medicinova, tried to change his testimony twice. Now, he was deposed in 2017, which supported this definition and there were a couple of other points that he supported, too, that went in favor of Genzyme. But when he supplied a declaration a year later, he changed his testimony. And even at his second deposition, Your Honors, he changed his testimony even more after a break after discussing the answer with counsel, not Mr. Chapman, but a different counsel from Medicinova. I heard the tone, Your Honor. My time is up. I, you know, our point generally is, as you know, that the district court's 42-page decision amply supported that, the intrinsic and extrinsic evidence, every type of intrinsic evidence that the court has. I think we're out of time. Thank you. Thank you. Mr. Chapman, Mr. Lichtenberg, how much time does Mr. Chapman have left? Mr. Chapman has 3 minutes and 40 seconds, Your Honor. Okay. Go ahead, Mr. Chapman. Thank you, Your Honor. I would like to start with the issue of the extrinsic evidence and the district court did find in Genzyme's favor in that regard, but the finding was that that evidence was consistent with its interpretation from the intrinsic evidence. And so there's no finding from the district court that the extrinsic evidence alone would compel the construction. I think that this is a case that turns on the intrinsic evidence and as an issue of law. In that regard, I would like to address the issue that Mr. DiGiovanni raised about the district court relying on the definition of accessory function to construe the claim term after adding the word virion. And I think the district court did more than use that definition to construe the term at issue. What it did was take a product claim that claimed a stock of virus and turned it into a product by process claim, a stock of virus produced in any way other than using HSV-1. And I believe that's more than simply a chain of definitions that helps construe the claim term. It is indeed a negative limitation. It's an exclusion, which I don't believe is warranted by the language in the patent. And lastly, I'd like to address the issue of if you disagree with the district court's interpretation of stock of virus being a stock of virions, this needs to be remanded or not. The entire logical chain that the district court relied upon to get to the negative limitation was based on the construction of virus being virions, because that is what then brought in the accessory function. The accessory function is used to produce virions. So without that construction limiting virus to virions, there wouldn't be a basis for reading in the accessory function, whether it's a definition or not. Why is it that the definition of accessory function standing alone is not sufficient to defeat you? The reason is that if the claim covers vectors other than virions, the accessory function is used to produce virions. And for example, in figure five, there is a plasma vector, a plasmid vector of recombinant AAV. And in our interpretation, that would also be covered by claim one and the other independent claims. Okay. Anything further? No, I believe by my clock, at least, I'm out of time now. Okay. Thank you, Your Honor. All right. Thank you. Thank both counsel. The case is submitted. That concludes our session for this morning. The Honorable Court is adjourned from day to day.